

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| MOORE FREIGHT SERVICES, INC., CHARLES "CHIP" STRADER, AND XMEX TRANSPORTS, L.L.C., | § | No. 08-14-00254-CV |
| | § | |
| Appellants, | § | Appeal from |
| | § | |
| v. | § | 168th District Court |
| | § | |
| LORENA MUNOZ, IND. AND ON BEHALF OF THE EST. OF | § | of El Paso County, Texas |
| LORENZO MUNOZ, AND AS N/F OF | § | (TC # 2010-4169) |
| C.M., A MINOR CHILD, | § | |
| LESLIE MUNOZ, VIRGINIA MUNOZ, JESSICA LOPEZ, AS N/F OF A.F. | § | |
| AND J.L., MINOR CHILDREN AND HEIRS TO THE EST. OF | § | |
| ROGER FRANCEWARE, DEC., AND ROSA FRANCEWARE, IND., | § | |
| | | |
| Appellees. | § | |

**O P I N I O N**

This is a suit for wrongful death, survival, and exemplary damages brought pursuant to Civil Practice and Remedies Code Chapters 71 and 41, respectively, by the beneficiaries and family members of Lorenzo Munoz and Roger Franceware. At issue is an August 17, 2010, single commercial motor vehicle accident in Mitchell County, Texas, in which Munoz and Franceware were killed after the tractor-trailer in which they were driving veered off the highway at a slight angle. Because we hold that there is legally insufficient evidence to support causation, we reverse and render.

# FACTUAL SUMMARY

## The Accident

On August 17, 2010, at or around 1:22 a.m., Central Standard Time, a Moore Freight Services, Inc. (Moore Freight) semi-truck (truck or Unit 311) occupied by two professional commercial truck drivers, Roger Franceware and Lorenzo Munoz, was traveling on Interstate Highway 20 in Mitchell County, Texas, when the truck drifted across the left shoulder and onto the grass median, damaging the steel cable barrier to its left and a guardrail to its right as it drove between them. All of the experts who testified at trial agreed that Unit 311 veered off the road as a result of driver inattention, particularly given the slight angle at which it drifted off the highway. After traveling approximately 295 feet parallel to the highway, Unit 311 plummeted into an uncovered concrete drainage channel that ran underneath and perpendicular to the highway. The drainage channel was about 35 feet wide and 25 feet deep. Unit 311 collided with the far retaining wall of the channel and caught on fire. Both Franceware and Munoz died in the crash.[1] There was no evidence of braking, steering to avoid an obstacle, or any mechanical failure or defect. There was no evidence of any interference from another vehicle or animal. Finally, there was no evidence that the truck was speeding, as expert J.W. Moore testified that it averaged a speed of about 65 miles per hour. An accident reconstructionist expert, Chris Ruble, testified that as little as two seconds of inattention would have been sufficient to cause the accident. Trooper Nathan Armstrong investigated the wreckage and labeled the first body he found as #1 and the second as #2, which were later identified as Franceware and Munoz, respectively. Munoz's body was discovered in the driver's seat with the steering wheel on top of him. From this, Trooper Armstrong, with the assistance of other first-responders, concluded that Munoz was the driver and Franceware was the passenger. Ruble agreed with Armstrong

---

[1] The medical examiners testified that Munoz suffered blunt force injuries to the chest while the cause of death in Franceware's instance was thermal injuries related to the fire.

2

regarding the position of the bodies. Ruble thought it unlikely that Unit 311's occupants could have switched places as a result of either the truck's movements during the crash, or the use of fire hoses to put out the fire. Ruble also opined that Munoz's chest injury was consistent with being in the driver's seat.

### Moore Freight Services, Inc.

Moore Freight is a commercial trucking company which operates as an interstate motor carrier for hire. In 2010, it had more than 200 tractor-trailers and operated four terminals in Laurinburg, North Carolina; Spring Hill, Kansas; Kingsport, Tennessee; and Knoxville, Tennessee. Moore Freight's main office was located about 20 miles from Knoxville in Mascot, Tennessee. Daniel Ray Moore owned the majority interest of Moore Freight and was the chief executive officer at the time of the events in question. In 2010, Randy Moore was acting president, Julie Reasonover was the manager of the accounting department, Judy Lowery was the manager of the human resources department, and Grant Mize was the Vice President of Operations. Mize was ultimately responsible for overseeing the movements and dispatch of all Moore Freight tractor-trailers.

As a motor carrier, Moore Freight is responsible for ensuring its employees and commercial motor vehicles are in compliance with the Federal Motor Carrier Safety Regulations (FMCSR). At the time of the accident, Moore Freight carried workers' compensation insurance.

Moore Freight hired Charles "Chip" Strader approximately four years prior to the accident. Initially, Strader worked as a dispatcher and information technology professional. Eventually, he was assigned to manage the southwest van division, which included El Paso County. Strader, as a manager, reported to Dan Moore, and then to Mize or Randy Moore whenever Dan Moore was unavailable. Moore Freight also authorized Strader to book loads and to assign and dispatch drivers. Strader managed six to ten Moore Freight drivers located in the

3

El Paso area. Strader was also the customer representative for Moore Freight for the El Paso area.

Unit 311 was owned and titled in Moore Freight's name. Unit 311 needed to travel to Tennessee for repairs and Dan Moore testified that this furthered Moore Freight's business. These repairs were cosmetic in nature and did not impede the truck's ability to operate safely on the road. In addition to transporting Unit 311 to Tennessee for cosmetic repairs, Franceware had some outstanding trip sheets and driver's logs, which needed to be submitted, and Munoz, as a prospective Moore Freight employee, needed to attend orientation, both of which also furthered Moore Freight's business.

<u>**Franceware's Background and Circumstances**</u>

Franceware was born on February 20, 1978. At the time of his death, he was not married and had four children: J.L., born in 2000; A.F., born in 1998; E.L.F., born in 1998; and M.C.[2] For most of his adult life, Franceware worked as a professional, over-the-road commercial truck driver. Driving trucks was Franceware's passion and he had a reputation as being a responsible, experienced, and professional driver. He took great pride in being a professional truck driver and prior to the accident, he had over ten years of experience on the road. Moore Freight hired Franceware on June 16, 2010, two months before the fatal accident occurred. Franceware normally drove Unit 313, sometimes referred to as "the show truck," which transported loads only within Texas. Before Moore Freight hired him, Franceware worked at CJ Trucking; Carnegie; Rio Grande Freightlines, Inc.; Christianberry Trucking and Farm, Inc.; and Southwest Freight Lines Trucking, Inc. The record is unclear as to whether Franceware received any fatigue or circadian rhythm training from any of these previous employers.

---

[2] M.C. did not participate in this lawsuit as a wrongful death beneficiary, and it is unclear from the record as to whether he has obtained the age of majority. Franceware did not have a relationship with M.C.

At the time of the accident, Franceware was in good health and well-rested. He was in compliance with the federally regulated 34-hour reset period and had not consumed any drugs or alcohol.

## Munoz's Background and Circumstances

Munoz was born on July 4, 1971. He married Lorena Munoz on August 20, 1991. They had three children, V.M., born May 8, 1992; L.M., born December 6, 1995; and C.M., born August 7, 2007. Munoz obtained his commercial driver's license and began driving commercial motor vehicles in 2003. At the time of the accident, Munoz had been driving commercial motor vehicles for seven years. He was considered a veteran driver. According to his wife, Munoz would not do things that presented a risk to himself. He always wore his seatbelt and ensured the vehicle he operated was in safe, working order. If he were tired, Munoz knew not to operate any heavy equipment. When he was out on the road, Munoz knew he had to spend time in his tractor to comply with the hours-of-service regulations. He was in good health and well-rested. At the time of the accident, Munoz was in compliance with the federally regulated 34-hour reset period and had not used drugs or alcohol. Munoz was not a Moore Freight employee. Instead, he was a prospective employee who, according to his wife, had applied with Moore Freight on August 6, 2010, and was traveling to Tennessee in Unit 311 for orientation. Telephone records reflect Strader and Munoz communicated before the accident. Munoz called Strader at Moore Freight's headquarters on August 3, 2010, and Strader called him back. Munoz called Strader again on August 14. During his testimony at trial, Strader could not recall whether he actually talked to Munoz, because "[he] got calls all the time from drivers wanting jobs." Phone records also showed a number of phone calls between Munoz and Moore Freight employee Jose "Shorty" Arras on August 6, 7, 10, 14, 15, and 16, 2010, none of which Arras could recall. Before the accident, Munoz worked for the City of Merced; Northern Refrigerated Transportation; Munoz

5

Trucking; Y&T Gutierrez Trucking; J.J. Transport; Federal Express; Acre's Transportation, Inc.; M.S. Cargo, Inc.; Los Angeles-El Paso Express; Lee Trucking, Inc.; Rowland Trucking; and Russell Transport. The record does not indicate whether Munoz received any fatigue or circadian rhythm training from these employers.

### Trans Front and Sotelo

Andres Sotelo is the owner of Trans Front, a transportation company. He is also part-owner of AVG Worldwide Logistics, a brokerage company that brokered the load involved in the accident.

### XMEX Transports, L.L.C.

Strader founded XMEX, a limited liability trucking company. The Articles of Organization were filed with the Department of State for the State of Tennessee on July 14, 2010. According to Strader, XMEX did not operate as a motor carrier prior to the accident, but extensive testimony at trial was dedicated to XMEX's operations occurring before August 17.

### Strader's Alleged Unauthorized Use of Moore Freight's Trucks and Drivers

According to Strader, Mize directed him to dispatch Unit 311 to Tennessee for repairs and maintenance. While Strader was a Moore Freight employee at the time of the accident, he was also starting his own trucking company, XMEX. Strader claimed that XMEX had not yet begun operating at the time of the accident, but several bank statements reflect that XMEX had already issued payments to drivers, including Franceware. Specifically, XMEX paid driver Juan "Shorty" Arras on August 11, 2010; Juan Camacho in August 2010 for trips he made two weeks prior; and Franceware on August 14, 2010, as well as on August 2, 2010, and in July 2010. Additional testimony revealed that the appearance of a new payor on a paycheck, such as XMEX, would not have alerted a driver like Arras, Camacho, or Franceware, that anything was amiss.

Evidence at trial also revealed that Franceware charged over $6,000 on his Moore Freight issued fuel card between July 16, 2010 and July 29, 2010, despite his failure to submit corresponding trip reports, log sheets, or fuel tickets to Moore Freight. In the months leading up to the accident, Moore Freight was aware of these charges and investigated the matter, ultimately terminating Franceware's access to his company fuel card. After the accident, copies of Franceware's completed log sheets were discovered at his house.[3] Strader testified that XMEX began issuing its own fuel cards, one of which was given to Franceware at the beginning of August 2010. Franceware began using the XMEX fuel card on August 2, 2010, four days after his Moore Freight fuel card was canceled. Strader testified that he informed a few of Moore Freight's El Paso customers, including Sotelo (Trans Front and AVG), that Dan Moore wanted to conduct business on a cash basis. Sotelo testified that rather than paying Strader in cash, Strader told him to begin writing checks to XMEX, which he did. According to Sotelo, Strader informed him that Dan Moore would ultimately receive the cash and the checks made payable to XMEX. Finally, evidence concerning the specific load being hauled to Tennessee by Franceware and Munoz -- No. 60729 -- was not entered into Moore Freight's computer system until after the accident occurred. On the morning of August 17, 2010, after learning of the accident, several Moore Freight employees were unable to locate load No. 60729 anywhere in the computer system. Strader testified that he inputted the specific load into Moore Freights computer system several days earlier, but that it was deleted the morning of the crash and then reentered into the system later that day. Other Moore Freight employees indicated that specific load numbers are generated automatically in numerical order by Moore Freight's computer system, and that the previous load -- No. 60728 -- was assigned after the accident, thereby making it impossible for load No. 60729, the load at issue, to have been assigned before the accident. Evidence at trial

---

[3] It is unclear whether Franceware was intentionally withholding his log sheets, or whether Franceware actually turned his log sheets into Strader, and Strader withheld them.

7

revealed that a load could not be deleted from Moore Freight's computer system; it could only be canceled and canceled loads still remained visible in the system. Finally, Marvin Breeden, safety director for Moore Freight, further testified that at around 4 p.m. on the afternoon of the accident, Strader told him he was inputting the load involved in the accident into the system.

### Moore Freight's Investigation of Strader

Dan Moore testified that he suspected that Strader might be engaging in fraudulent activity leading up to the accident, but he lacked sufficient proof of his suspicions. In addition to the Franceware fuel documentation issue, Dan Moore was aware that: (1) some drivers under Strader's supervision had complained about not being timely paid; (2) some customers had complained about not getting timely information; (3) some suspicious trailer movements had been identified by electronic monitoring available on certain units, which Strader denied knowing about when asked and which Dan Moore continued to monitor; and (4) Strader had recently undergone a change in attitude. In response to these issues, Dan Moore moved Strader's office next to his own so he could personally monitor Strader. Moore also met with Moore Freight's top-level management to discuss Strader's suspected fraudulent activity, specifically the possibility that Strader was using Moore Freight equipment to run unauthorized loads on behalf of his company, XMEX. The managers continued to investigate Strader's activities, but none of the managers -- Randy Moore, Mize, Sparks, nor Reasonover -- testified regarding the details of the investigation.

### The Load Involved in the Accident

Strader testified that because it was unprofitable for the Unit 311 tractor to travel such a long distance without pulling a trailer, he called around looking for a load that needed to be delivered near Moore Freight's headquarters. AVG found a trailer for Unit 311 to haul -- SMTC's trailer -- containing 23 pallets of computer components.

According to the information sheet, the 23 pallets of computer components were scheduled to be picked up on Friday, August 13, 2010, and delivered on Tuesday, August 17, 2010. Ruben Alvarado, an employee of the sending company, testified that the load was due on Monday, August 16, 2010, and that it was very important for it to arrive on time. Munoz and Franceware left El Paso at 6 p.m. on Monday, August 16, 2010. Given the testimony elicited at trial, the load was either already late (by Ruben Alvarez's standards), or was due in less than 24 hours (according to the load information sheet). The load's pick-up point was Pendale Road in El Paso and its destination was Greensboro, North Carolina, 1,723 miles away. Given the distance, it would take a single driver approximately 2.4 days to make the trip from El Paso to Greensboro, and a team of drivers might be able to make trip in roughly 24 hours. Strader consistently denied authorizing a "team drive." He also testified that he could have called and rescheduled the delivery, but ultimately did not do so.

### The Events Preceding the Accident

On Thursday, August 12, 2010, Franceware returned to El Paso after having been out of town. He was home Friday, August 13, through Sunday, August 15. That Sunday, Franceware played paintball with his family and then went to his mother's house during the evening. By 6:00 p.m. on August 16, Franceware had rested for more than 48 hours since his previous trip, in compliance with federal trucking regulations.

On Saturday, August 14, 2010, Munoz and his wife spent time with Munoz's sister. On Sunday, they visited Lorena's grandmother in Juarez, Mexico. They went to bed at approximately 10:30 p.m. At 5:30 a.m. on Monday, August 16, Lorena left for work while Munoz slept. By 6:00 p.m. that evening, Munoz had been home for more than 36 hours.

And so, at 6:00 p.m., Franceware and Munoz met at the Petro fuel station in Horizon City, Texas, to travel to Moore Freight's headquarters in Unit 311. Juan Camacho, a Moore

9

Freight employee, normally drove Unit 311, but turned his keys over to Franceware earlier that Monday morning for Franceware's trip to Tennessee.[4] Unit 311 needed to be brought to Moore Freight's headquarters for cosmetic work to replace a fender.

There were no mechanical issues with Unit 311 or its trailer. The brakes, steering, and engine components were working and in good condition. When Lorena dropped Munoz off at the Petro station, she observed Franceware get into the driver's seat side while Munoz got into the passenger's seat. However, she did not watch them drive off and could not say who was driving when the truck left the Petro station. She did notice a cosmetic issue with the paint on the front of Unit 311. The trailer attached to Unit 311 was also mechanically sound and there were no issues with its load. Strader testified that he last recalled speaking to Franceware on August 13, 2010, despite telephone records reflecting calls between Strader and Franceware on August 15 and 16, neither of which Strader could recall. Phone records also reflect multiple calls between Sotelo and Franceware on August 14, 15, and 16, none of which Sotelo could recall.

## Litigation and Relevant Procedural History

After a three week trial, the jury returned a verdict finding the following individuals and entities proportionately responsible:

| | |
|---|---|
| Munoz | 40% |
| Strader | 23% |
| XMEX | 20% |
| Franceware | 10% |
| Moore Freight | 5% |
| Sotelo | 2% |

The jury also found that Franceware acted as an employee of both Moore Freight and XMEX; that Strader acted as an employee of XMEX only; and that Munoz acted as an employee of neither Moore Freight nor XMEX. The trial court subsequently entered final judgment in June

---

[4] Strader initially called Camacho on August 14 and 15 to see if he were available for the trip to Tennessee, but Camacho was driving back to El Paso from California and was unable to take the load. Because Strader called too late on August 15, Camacho was unable to deliver the keys to Franceware until the morning of August 16.

2014, imposing joint and several liability on XMEX for the entire judgment.  Each defendant filed a motion for judgment notwithstanding the verdict which were denied.  Moore Freight, Strader, and XMEX have all appealed.

## ISSUES FOR REVIEW

Appellants Moore Freight, Strader, and XMEX all challenge the sufficiency of the evidence to support the jury's findings that each was a proximate cause of the accident. Appellees/Cross Appellants Jessica Lopez – as the administratrix of the Franceware estate and as next friend of A.F. and J.L. – and Rosa Franceware – independently and as next friend of E.L.F. – have challenged the sufficiency of the evidence to support the jury's findings that Franceware proximately caused the accident. Because the issue of causation is dispositive, we will address causation and how it relates to each litigant.  The sections addressing Moore Freight and XMEX's liability will also contain a discussion on vicarious liability.  Because we agree with that proximate cause is lacking, we need not address the remainder of the issues.

## CAUSATION

### Standard of Review

We review a trial court's denial of a judgment notwithstanding the verdict under a legal sufficiency standard. *Nottingham Manor Owners Ass'n v. El Paso Electric Co.*, 260 S.W.3d 186, 192 (Tex.App.--El Paso 2008, no pet.).  A party challenging the legal sufficiency of an adverse finding on an issue upon which it did not have the burden of proof must demonstrate that no evidence supports the finding.  *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex.App.--Dallas 2012, no pet.).  We will sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following:  (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more

11

than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

In conducting a legal sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. The term "inference" means:

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex.App.--Houston [1st Dist.] 1993, writ dism'd w.o.j.)(internal citations omitted). "For a jury to infer a fact, it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

If there is more than a scintilla of evidence to support the challenged finding, the finding must be upheld. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)(internal citations omitted). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.*

Finally, the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and it is improper to substitute our judgment for the jury's simply because we may disagree with its findings. *Id.* at 819. The jury may choose to believe one

witness and disbelieve another. *Id.* We must assume jurors decided all credibility questions in favor of the verdict if reasonable jurors could do so. *Id.*

**Applicable Law**

The elements of negligence are the existence of a legal duty, breach of that duty, and damages proximately caused by the breach. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 352 (Tex. 2015); *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)(citation omitted). Assuming without deciding that Moore Freight, Strader, and XMEX owed the plaintiffs a duty and breached that duty, we focus on whether: (1) Moore Freight's failure to supervise or terminate Strader; (2) Strader's failure to reschedule the load; and (3) XMEX's failure to implement compliance procedures, proximately caused the injuries alleged.

The components of proximate cause are cause-in-fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). These elements cannot be established by mere conjecture, guess, or speculation. *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980); *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 755 (Tex. 1975). The test for cause-in-fact is whether the negligent "act or omission was a substantial factor in bringing about injury," without which the harm would not have occurred. *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995), *citing McClure*, 608 S.W.2d at 903; *see Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 458-59 (Tex. 1992); *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988). Cause-in-fact is not shown if the defendant's negligence did no more than furnish a condition which made the injury possible. *See Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968). As the Texas Supreme Court stated in *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939), "The evidence must go further, and show that such negligence was the proximate,

13

and not the remote, cause of resulting injuries . . . [and] justify the conclusion that such injury was the natural and probable result thereof." *See, e.g., Boyd v. Fuel Distribs., Inc.*, 795 S.W.2d 266, 272 (Tex.App.--Austin 1990, writ denied)(holding that a convenience store's sale of beer to an eighteen-year-old was not the cause-in-fact of a drunk driver's fatal car accident because the sale was to the passenger and not to the driver); *Texas Am. Bank v. Boggess*, 673 S.W.2d 398, 402 (Tex.App.--Forth Worth 1984, writ dism'd by agr.)(ruling that a bank's employment of a repossessor was not the cause-in-fact of the car owner's injuries since the owner was injured by a person that the repossessor had hired without the bank's knowledge). In other words, even if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause. *See Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991).

## Did Moore Freight Cause the Accident?

### *Direct Liability*

Moore Freight first challenges causation, contending that there is no evidence to support the jury's finding that it proximately caused the accident. Specifically, the company maintains that its failure to terminate or supervise Strader was not a cause-in-fact of the accident. Moore Freight further argues that the record does not support a finding that its noncompliance with regulations caused the accident. Appellees respond that the record supports the jury's assignment of both direct liability and vicarious liability because the jury found that Franceware was acting in the course and scope of his employment with both Moore Freight and XMEX.

An employer who negligently hires, retains, or supervises an incompetent or unfit individual may be directly liable to a third party whose injury was proximately caused by the employee's negligent or intentional act. *Castillo v. Gared, Inc.*, 1 S.W.3d 781, 786 (Tex.App.--

14

Houston [1st Dist.] 1999, pet. denied)(asserting that negligent supervision claims are to be analyzed as negligence), *citing Mackey v. U.P. Enterprises, Inc.*, 935 S.W.2d 446, 459 Tex.App.--Tyler 1996, no writ); *accord Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 294 (Tex. 1996); *Garcia v. Allen*, 28 S.W.3d 587, 592 (Tex.App.--Corpus Christi 2000, pet. denied); *Verinakis v. Med. Profiles, Inc.*, 987 S.W.2d 90, 97 (Tex.App.--Houston [14th Dist.] 1998, pet. denied); *Houser v. Smith*, 968 S.W.2d 542, 544 (Tex.App.--Austin 1998, no pet.); *Robertson v. Church of God, Int'l*, 978 S.W.2d 120, 124 (Tex.App.--Tyler 1997, pet. denied); *see also* 49 C.F.R. §§ 385.11, 392.1 (2012)(Federal Motor Carrier regulations).  And, there must be sufficient evidence to indicate the defendant knew or should have known of the potential harm for liability to be imposed.  *Ianni v. Loram Maintenance of Way, Inc.*, 16 S.W.3d 508, 514 (Tex.App.--El Paso 2000, pet. denied).

A claim of negligent hiring, supervision, or retention is not dependent upon a finding that the employee was acting in the course and scope of his employment when the tortious act occurred.  *Dieter v. Baker Service Tools, A Div. of Baker Intern. Inc.*, 739 S.W.2d 405, 408 (Tex.App.--Corpus Christi 1987 writ denied), *citing generally, Salinas v. Fort Worth Cab & Baggage Co.*, 725 S.W.2d 701 (Tex. 1987).  The cause of action is based on an employer's direct negligence instead of the employer's vicarious liability for the torts of its employees.  *Sibley v. Kaiser Foundation Health Plan of Texas*, 998 S.W.2d 399, 403-04 (Tex.App.--Texarkana 1999, no pet.); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d 942, 950 (Tex.App.--Amarillo 1994), *aff'd*, 907 S.W.2d 472 (Tex. 1995).

To successfully prosecute a claim of negligent hiring, supervision, or retention, the Plaintiffs were required to show (1) that Moore Freight owed a legal duty to protect Munoz and Franceware from Strader's actions, and (2) that Munoz and Franceware sustained damages proximately caused by Moore Freight's breach of that legal duty.  *Houser*, 968 S.W.2d at 544;

15

*see also Peek v. Equipment Services, Inc.*, 906 S.W.2d 529, 534 (Tex.App.--San Antonio 1995, no pet.)(holding basis of responsibility for negligent hiring is master's own negligence in hiring or retaining an incompetent servant whom the master knows or by the exercise of reasonable care should have known was incompetent or unfit, thereby creating an unreasonable risk of harm to others). The duty of the employer extends only to prevent the employee or independent contractor from causing physical harm to a third party. *Sibley*, 998 S.W.2d at 403-04; *Verinakis*, 987 S.W.2d at 97-98. The Plaintiffs had to show that Moore Freight's actions in hiring, supervising, or retaining Strader were the cause-in-fact of Munoz's and Franceware's injuries and that their injuries were a foreseeable consequence of Moore Freight's hiring, supervision, or retention of Strader. *See Houser*, 968 S.W.2d at 544.

Moore Freight contends that its failure to address Strader's conduct was too attenuated, perhaps only functioning to furnish a condition that made this accident possible. The Appellees all argue that Moore Freight is directly liable for the accident because its negligence was continuous, ongoing, and unbroken. We agree with Moore Freight that the evidence is insufficient to show that its failure to supervise or terminate Strader directly caused the accident.

The Supreme Court has on several occasions addressed attenuation of the causal connection between conduct and liability. *See, e.g., Union Pump Co. v. Allbritton*, 898 S.W.2d 773 (Tex. 1995); *Lear Sigler, Inc. v. Perez*, 819 S.W.2d 470 (Tex. 1991); *Bell v. Campbell*, 434 S.W.2d 117 (Tex. 1968). In *Bell*, three individuals were hit by a car while removing debris from an earlier car accident. 434 S.W.2d at 118. Two of the men were killed, and the third suffered serious injuries. *Id.* The court held that the initial accident was not the proximate cause of the deaths and injuries because it only created the condition that attracted the three men to the scene and did not actively contribute to the injuries resulting from the second accident. *Id.* at 122. Where the initial act of negligence was not the active and efficient cause of plaintiffs' injuries,

16

but merely created the condition by which the second act of negligence could occur, the resulting harm is too attenuated from the defendants' conduct to constitute the cause in fact of plaintiffs' injuries. *See id.*

In *Lear Siegler*, Rafael Perez, while working for the Texas Highway Department, pulled a flashing arrow sign behind a sweeping operation to warn drivers about ongoing highway maintenance. 819 S.W.2d at 471. Perez stopped his truck when the sign malfunctioned, and a van driven by Alfonso Lerma, who had fallen asleep at the wheel, struck the sign which in turn struck Perez, causing severe injuries from which Perez later died. *Id.* The legal representative of Perez's estate claimed that Lear Siegler manufactured a defective sign which proximately caused Perez's injuries. *Id.* The Supreme Court determined that, as a matter of law, the circumstances of the accident were too remotely connected with Lear Siegler's conduct to constitute the proximate cause of Perez's death. *Id.* at 472. While acknowledging that a defendant's negligence may expose another to an increased risk of harm by placing him in a particular place at a given time, it recognized that the "happenstance of place and time" may be too attenuated for liability to be imposed under the common law. *Id.*

In *Union Pump*, a pump caught fire at a Texaco Chemical Company facility. 898 S.W.2d at 774. Sue Allbritton, an employee of Texaco, assisted in extinguishing the fire. *Id.* Two hours after the fire was abated, Allbritton and a fellow employee went to block a nitrogen purge valve at the request of their employers. *Id.* Upon reaching the valve, they were informed that it was not necessary to block the valve. *Id.* As the two of them returned from the purge valve, they walked over a pipe rack, which was still wet from the efforts to extinguish the fire, and Allbritton fell and was injured. *Id.* Allbritton alleged that Union Pump caused her injuries by manufacturing a defective pump which caused the fire, which in turn led to the pipe rack being wet and slippery, and ultimately caused her injuries. *Id.* The Supreme Court held that the

17

circumstances surrounding her injuries were too remotely connected with the defective pump to constitute the cause in fact of her injuries. *Id.* at 776. The pump, by causing a fire, did no more than create the condition which made the plaintiff's injuries possible. *Id.* Our precedents establish that merely creating the condition that makes harm possible falls short as a matter of law of satisfying the substantial factor test.

Similarly, Moore Freight's failure to supervise or terminate Strader did no more than create the condition which made Franceware and Munoz's injuries possible, at best. It is undisputed that Unit 311 drifted off the road due to driver inattention. Better supervision or termination of Strader would have had no effect on the driver's conduct. We conclude that these particular circumstances are too remotely connected with Moore Freight's conduct to constitute legal cause. Moreover, assuming that Moore Freight had terminated Strader for his unauthorized activities or had perhaps provided better supervision, the outcome would be that Strader would no longer be working at the company and no longer running allegedly unauthorized loads. This would have nothing to with the events that contributed to the injuries to Munoz and Franceware -- i.e., the truck drifting off the road due to driver inattention. Moore Freight's failure, if any, to provide better supervision of or to terminate Strader because he was running unauthorized loads was not the cause-in-fact of Munoz's or Franceware's injuries.

It is human nature to place blame on someone for unspeakable events that transpire. But the law will not allow us to do that on these facts. No one knows why the truck left the highway, drifted off the road into a culvert, and burst into flames. One of the keys to this mystery is the manner in which the truck left the road: it *drifted* off the road. In fact, there is no evidence in the record tending to prove that Moore Freight's negligence rather than any other factor somehow caused the truck to leave the road. Without this evidence, we can only speculate, and our speculation -- where any number of possible causes exist and none is more probable than another

18

-- cannot support the jury's affirmative finding on proximate cause. *Reinicke v. Aeroground, Inc.*, 167 S.W.3d 385, 393 (Tex.App.--Houston [14th Dist.] 2005, pet. denied); *See also Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728-29 (Tex. 2003)(per curiam).

Relatedly, Moore Freight also contends that there is no evidence that its noncompliance with regulations caused the accident. For example, expert J.W. Moore testified that Moore Freight's failure to comply with federal trucking regulations, specifically, its failure to properly screen drivers to ensure they are qualified, caused the accident to occur. While the record contained evidence that Munoz was not yet an official Moore Freight employee and did not have his (1) hours-of-service logs, (2) medical examination, (3) drug test, or (4) driving record on file, the screening claim still must fail.

To be successful on a negligent screening claim, a plaintiff is required to prove that something in the screening process would have put the screener on notice of a particular risk of harm. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 240 (Tex. 2010)("To sustain . . . a failure to screen [claim], a plaintiff must show that anything found in a background check 'would cause a reasonable employer to not hire' the employee, or would be sufficient to put the employer 'on notice that hiring [the employee] would create a risk of harm.'"); *see also Doe*, 907 S.W.2d at 477. Here, the evidence indicated that both Munoz and Franceware (1) had taken sufficient time off in compliance with the federal hours-of-service requirements; (2) were in good health; (3) had no drugs or alcohol in their systems; and (4) had good driving records. Even if Moore Freight had undertaken each step of the screening and qualification process, nothing in Munoz's background would have alerted Moore Freight that hiring him would have created a risk of harm. We conclude that the evidence was legally insufficient to support the jury's finding that Moore Freight caused the accident in question.

*Vicarious Liability for Strader's Acts?*

The jury found that Strader was not acting in the course and scope of his employment with Moore Freight. Moore Freight insists that it cannot be held vicariously liable for Strader's conduct because of the jury's findings. The Munoz Plaintiffs appear to concede this issue. We conclude that the evidence is legally insufficient to hold Moore Freight vicariously liable for Strader's conduct because he was not acting in the course and scope of his employment at the time the accident occurred.

*Vicarious Liablility for Franceware's Acts?*

Under the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an employee acting within the scope of his employment, although the employer has not personally committed a wrong. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541-42 (Tex. 2002); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 713 (Tex.App.--Fort Worth 2006, no pet.). "The most frequently proffered justification for imposing such liability is that the principal or employer has the right to control the means and methods of the agent or employee's work." *Wolff*, 94 S.W.3d at 542, *quoting Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998).

An agent must first act in the course and scope of his employment before his knowledge can be imputed to his principal. *Tex. Bank & Trust v. Helmcamp*, 506 S.W.2d 667, 669 (Tex.App.--Fort Worth 1974, no pet.). To defeat a claim of vicarious liability, Moore Freight was required to establish as a matter of law either that: (1) Franceware and Strader were not employees; (2) no negligent act occurred; or (3) Franceware and Strader were not acting within the course and scope of their employment at the time of the collision. *See Drooker v. Saeilo Motors*, 756 S.W.2d 394, 396 (Tex.App.--Houston [1st Dist.] 1988, writ denied), *citing Leadon v. Kimbrough Bros. Lumber Co.*, 484 S.W.2d 567, 569 (Tex. 1972).

20

Course and scope of employment is generally a fact issue like negligence or proximate cause. *See, e.g., GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999); *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 515 (Tex. 1995). The primary test for determining whether an employee is acting within the course and scope of employment is whether the employer has the right to direct and control the employee's performance at the time of the alleged negligent act. *Wolff*, 94 S.W.3d at 542 ("the right to control remains the 'supreme test' for whether the master-servant relationship exists" and thus whether the rule of vicarious liability applies), *quoting Akins*, 926 S.W.2d at 290; *American Nat'l Ins., Co. v. Denke*, 128 Tex. 229, 95 S.W.2d 370, 373 (1936); *see also* RESTATEMENT (SECOND) OF AGENCY §§ 212, 219, 235 cmt. a (1984). To ultimately prove that an employee acted within the course and scope of employment, the Appellees must have proved that the act was (1) within the general authority given to the employee; (2) in furtherance of the employer's business; and (3) for the accomplishment of the object for which the employee was employed. *Leadon*, 484 S.W.2d at 569.

The record supports the jury's finding that Franceware was acting in the course and scope of his employment with Moore Freight at the time of the accident. Moore Freight hired Franceware approximately two months before the fatal accident. Strader, as southwest division manager, dispatched Franceware to travel from El Paso to Tennessee in Unit 311 for cosmetic repairs. Franceware also needed to submit outstanding trip sheets and driver's logs, as well as bring Munoz to Tennessee for orientation. Franceware was clearly furthering Moore Freight's business at the time of the accident.

But that is not the end of our inquiry. We still must determine whether the evidence supports the jury's finding that Franceware's actions proximately caused the accident, thereby allowing the jury to impute Franceware's negligence to Moore Freight. *See Bell*, 205 S.W.3d at

21

713. Moore Freight contends that the evidence does not support a finding that Franceware was negligent, either by driving Unit 311 or by allowing Munoz to drive. Although the jury was not asked to determine who was driving the truck, the evidence does not support the proposition that Franceware was driving.

Moore Freight next maintains that the evidence is insufficient to show that Franceware was negligent in allowing Munoz to take the wheel. The Munoz Plaintiffs insist that Franceware did not exercise reasonable care when he allowed Munoz to drive "for only he could have ceded control" of the truck to Munoz. We disagree that only Franceware could have authorized Munoz to drive. Strader, Sotelo, or any other dispatcher or manager for that matter, could also have decided to place Munoz at the wheel. It remains unknown what Strader and Sotelo discussed during their phone conversations with Franceware and Munoz before the accident, as well as what Franceware did or did not say while in the truck.[5] There is no evidence from which a fact-finder could reasonably infer that Franceware made the decision to allow Munoz to drive Unit 311.

### Did Strader Cause the Accident?

In their brief, Strader and XMEX maintain that there is no evidence to support the contention that Strader caused the accident by failing to either reschedule the delivery or dispatching the load so late that it would either lead a driver to rush the delivery or operate the truck in a manner in which he would likely become fatigued. We agree.

First, the fact that the load did not leave when anticipated did not cause the accident. XMEX highlights the dual nature of the trip. Regardless of the movement of the trailer and its

---

[5] Additionally, a person is not liable for negligent entrustment of a motor vehicle to another person unless he knows or should know that the other driver is unlicensed, incompetent, or reckless. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007). The record lacks evidence indicating that Franceware knew or had reason to know Munoz was not qualified to drive; it is similarly unknown what Strader or Munoz told Franceware about Munoz's qualifications, experience, or ability to drive. And as conceded by the Munoz Plaintiff's expert, it is "difficult if not impossible" to criticize Franceware, without knowing what he knew.

22

load, the evidence established that Unit 311 was still going to Tennessee so that: (1) Franceware could submit his driving logs, (2) Unit 311 could undergo repairs, and (3) Munoz could attend orientation. In other words, even if the load been rescheduled for a later date or canceled entirely, Unit 311 would still have left El Paso on August 16, 2010, at approximately 6 p.m. with both Franceware and Munoz in the cab. Accordingly, we agree that there is legally insufficient evidence in the record to support a finding that Strader's failure to reschedule the load or his failure in dispatching it so late was a cause-in-fact of the accident. *Mason*, 143 S.W.3d at 799 ("Where the initial act of negligence was not the active and efficient cause of plaintiffs' injuries, but merely created the condition by which the second act of negligence could occur, the resulting harm is too attenuated from the defendants' conduct to constitute the cause in fact of plaintiffs' injuries.").

We also agree that the evidence is insufficient to show that because Strader dispatched the load so late, Unit 311 had to rush to deliver it. The load's delivery deadline was August 17, 2010, or as soon as possible. The Plaintiffs claim that because the load was due within 24 hours of the time Unit 311 left the Petro Station, Unit 311 had to rush to meet the deadline, which in turn, caused the accident. But the evidence reflects that that the truck was not speeding. According to Trooper Armstrong's investigation, the posted speed limit on the stretch of highway where the accident occurred was 65 mph. Unit 311 was averaging a speed of 65 mph. Dan Moore testified that it would take a single driver several days to make the trip from El Paso to Greensboro, North Carolina, and the length of the trip would even pose difficulty for a team of two drivers to complete in 24 hours. In fact, Strader testified that even with two drivers, the load would not have been delivered on time. In other words, even if both Munoz and Franceware were driving, Unit 311 would not have met its 24-hour delivery deadline. Without evidence of speeding, it cannot be inferred that Unit 311 was rushing to make its delivery. Strader and

23

XMEX also challenge the sufficiency of the evidence to support a finding that Strader's scheduling caused the driver to operate in a manner likely to lead to fatigue. Under the FMCSRs, a driver may be on-duty for 14 hours a day but may only drive for 11 hours per day. After that, the driver must be off-duty for 10 hours. Once a driver reaches his 70 hours of driving over an 8-day period, he must then reset the period with 34 hours of rest. After a driver has been off-duty for 34 hours or more, the reset period concludes, and the driver is then authorized to begin driving again.

Both Munoz and Franceware rested for the minimum 34 hours as required by the FMCSRs prior to beginning the trip to Tennessee. The accident took place at approximately 1:30 a.m., only six and a half hours after the truck left the Petro station.Given the time of the accident, neither Munoz or Franceware could have exceeded the maximum 11 hour limitation imposed by the FMCSRs. The Plaintiffs rely on J.W. Moore's testimony that Strader's scheduling caused Unit 311 to be driven at night and that some drivers are uncomfortable driving at night. Presumably this refers to the possibility of a driver becoming fatigued. But there is no evidence to show that fatigue, rather than reaching for an object or being distracted for any number of other reasons, caused the truck to drift off the road. Because the evidence shows that both Munoz and Franceware were well-rested and in compliance with the FMSCRs reset period, any finding that Munoz and Franceware were fatigued is unsupported by the evidence. *Reinicke*, 167 S.W.3d at 393.

**Did XMEX Cause the Accident?**

*Direct Liability*

XMEX also contends that its failure to properly screen Munoz and Franceware cannot be the cause of the accident. Appellees assert that if XMEX had such processes in place, the accident would not have occurred, relying once again, on J.W. Moore's expert testimony. This

challenge was already addressed in the context of Moore Freight's processes, specifically, that its failure to properly screen Munoz caused the accident. We adopt our analysis in that section and conclude similarly here that the evidence is legally insufficient to support a finding that XMEX's failure to implement such processes was a cause-in-fact of the accident. Nothing, as J.W. Moore conceded at trial, would have put XMEX on notice that either Munoz or Franceware posed some type of risk of harm if hired.

Relatedly, XMEX disputes that failure to monitor driver fatigue caused the accident. Once again, even if Strader and XMEX had a process in place to monitor fatigue, it would not have put them on notice of any risk presented by Munoz or Franceware as the evidence supports that both were well-rested at the start of the trip, in excess of the 34-hour reset requirement required by the FMCSRs. We agree with XMEX that there is legally insufficient evidence to support a finding that its failure to implement proper processes to qualify, screen, or monitor fatigue of its drivers caused the accident. *Reinicke*, 167 S.W.3d at 393.

### *Vicarious Liability*

XMEX challenges the sufficiency of the evidence to hold it vicariously liable for both Franceware's and Strader's conduct. We will first address XMEX's liability as it relates to Franceware's activities. XMEX maintains that the record does not support the jury's finding that Franceware acted in the course and scope of his employment with both Moore Freight and XMEX. It contends the evidence only supports a finding that Franceware was acting on behalf of Moore Freight. Under the joint employer doctrine, a person may be the servant of two employers at one time as to one act if the service to one does not involve the abandonment of the service to the other. RESTATEMENT (SECOND) OF AGENCY § 226 (1984); *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 199 (Tex. 2007)(Hecht, J., concurring in part and dissenting in part)("whether one can [or should] serve two masters, the law allows it and generally makes both

25

employers liable for the agent's actions"). If there is evidence of joint control of by Moore Freight and XMEX, a finding that Franceware was an employee of XMEX when the accident occurred would be proper. *Gulf Oil Corp. v. Williams*, 642 S.W.2d 270, 272 (Tex.App.-- Texarkana 1982, no writ). While there is understandably a certain degree of tension between Franceware's duties to Moore Freight and his service to the unauthorized XMEX operation, the Restatement expressly anticipates this tension, ultimately determining that it remains consistent with the course and scope analysis:

> [S]ervice to two masters at the same time normally involves a breach of duty by the servant to one or both of them. A person, however, may [nevertheless] cause both employers to be responsible for an act which is a breach of duty to one or both of them. He may be the servant of two masters, not joint employers as to the same act, if the act is within the scope of his employment for both[.]

RESTATEMENT (SECOND) OF AGENCY § 226.

We previously determined the evidence is sufficient to support the jury's finding that Franceware was acting in the course and scope of his employment with Moore Freight. The record also supports the jury's finding that Franceware was acting in the course and scope of his employment with XMEX. Bank records revealed that Franceware had already been paid by XMEX and had driven for the company on several occasions prior to the accident. While Franceware was assigned a Moore Freight tractor to drive, there is ample evidence that the particular load was being hauled on behalf of XMEX, as arranged by Strader, who dispatched Franceware for this trip. The jury's finding that Franceware was acting in the course and scope of his employment with XMEX and with Moore Freight is supported by the record.

The inquiry, however, does not stop there. We still must find Franceware's negligence, if any, was the proximate cause of the accident in order to impute his liability to XMEX. Just as we concluded that Franceware's actions -- either by driving while fatigued, or allowing an unauthorized driver like Munoz take the wheel -- were simply too remote to find that he caused

26

the accident thereby prohibiting the imposition of vicarious liability to Moore Freight, we similarly conclude that these acts cannot be imputed to XMEX.

On a related note, XMEX contends that the evidence is insufficient to show that Strader was acting in the course and scope of his employment with XMEX. In fact, Strader and XMEX argue that all of the evidence points to Strader being an exclusive employee of Moore Freight. We disagree. While no party disputed Strader's status as a Moore Freight employee, the following evidence revealed that: (1) Strader was almost exclusively involved in dispatching the particular load in question; (2) there was no indication that anyone other than Strader authorized the load to be transported to North Carolina; (3) the trailer hauling the load was not owned by Moore Freight, which exclusively transports its own trailers; (4) the load at issue was not entered into Moore Freight's computer system; (5) testimony from several Moore Freight employees revealed that the load numbers were assigned in chronological order and could not be deleted, as Strader had initially testified; and (6) Strader admitted that he entered the load into the system after the accident had already occurred. From this, a reasonably jury could infer that Strader dispatched the load on behalf of XMEX. Nonetheless, because the evidence does not support a finding that these actions by Strader proximately caused the accident, the evidence is insufficient to hold XMEX vicariously liable.

## CONCLUSION

We sustain Moore Freight's Issue One and do not consider its remaining issues. We sustain Strader and XMEX's first issue and do not consider the remainder. We sustain Rosa Franceware's first issue and do not consider the second. Finally, we sustain Jessica Lopez's first issue and do not address the remainder. Having concluded that these parties have established the record reveals legally insufficient evidence as to causation, we reverse and render judgment

27

that Appellees take nothing against Moore Freight, Strader, and XMEX. Our resolution of Franceware's and Lopez's causation challenges do not alter the result.

July 26, 2017
ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, J., and Larsen, J., (Senior Judge)
(Larsen, J., Senior Judge, sitting by assignment)